## Wimer, Appellant, v. Harner.

*Evidence—Conflict—Case for jury.*

In an action of assumpsit to recover the value of a horse alleged to have been the property of the plaintiffs where the evidence is contradictory, it is for the jury to reconcile the testimony of the witnesses, if possible, and if they cannot do so, to determine which of the witnesses they will believe.

Argued Nov. 10, 1915.   Appeal, No. 283, Oct. T., 1915, by plaintiffs, from judgment of C. P. Lancaster Co., Aug. T., 1914, No. 76, on verdict for defendant in case of Joseph H. Wimer and Isaac Montgomery, Receivers of the Quarrysville Coach Horse Company, v. C. L. Harner. Before RICE, P. J., ORLADY, HEAD, PORTER, HENDERSON, KEPHART and TREXLER, JJ.   Affirmed.

Assumpsit to recover the value of a horse.   Before LANDIS, P. J.

At the trial the jury returned a verdict for defendant upon which judgment was entered.

On motion for a new trial LANDIS, P. J., filed the following opinion:

Many of the facts which arose upon the trial were not in dispute.   A number of persons associated them-

selves together under the name of the Quarryville
Coach Horse Company, and the company then pur-
chased a stallion for service. It was agreed among
them that the stallion should be handled by one, Ira
Stewart, and it was placed in his possession and re-
tained by him for about three years. In the month of
April, 1913, he had it at Nottingham, Chester County.
The members of the company were desirous of procur-
ing a settlement with Stewart and of securing posses-
sion of the stallion, and a meeting was, therefore, held
at Quarryville, at which a committee, consisting of
William Myers, Joseph H. Wimer and Charles L.
Harner, the defendant, was appointed. This committee
was authorized to make the best settlement they could
and secure possession of the stallion. The committee
went down to see Stewart. He refused to deliver up
the stallion, but agreed that it should be put up at
public sale and sold to the highest bidder. It was then
agreed that a sale should be held and that the commit-
tee should have the matter in charge. A sale was ad-
vertised and was actually held at the Unicorn on April
17, 1913, and the stallion was then knocked down to
Harner for $600. A note was signed by Harner and
Joseph H. Wimer for that amount, payable at the Farm-
ers National Bank of Quarryville, and the note when
presented upon the trial, showed opposite the names
of these gentlemen the word "Per Com." The note
was never used, but was handed back on the day of
the sale to Harner. Immediately after the sale, the
stallion was placed in the possession of William Myers,
the other member of the committee, who kept him for
several weeks, and he was then delivered to a man by
the name of Slentz. While the horse was in Slentz's
possession, he died. It was contended on the part of
the defendant that the sale was a sham sale and was
gotten up for the purpose of getting the stallion out of
the possession of Stewart; whereas, on the other hand,
the plaintiffs' witnesses testified that no such arrange-

ment was made and that the committee was never given any authority to so act; that the committee did not buy the horse, but that it was sold to Harner for himself and not for the company. It was testified by Harner and Wimer, two of the members of the committee, that the stallion was not sold to Harner individually, and it was in addition testified by Charles F. Hess, who was the secretary of the company, that the committee was appointed to do the best they could to get the horse or the money, and that his understanding was that Harner was not to pay for the horse. The minutes were read, but not offered in evidence, and they contain no record to that effect. The court, in instructing the jury, said: "Now, these are really the disputed points between the parties; and we say to you that, if, from all the evidence, you find that Harner purchased this horse for himself, then he owes this money, and the verdict should be for the sum of $600, with interest. If, on the contrary, the manner of procuring the horse was placed in the hands of the committee,—these three persons,— and this committee authorized Harner to buy the horse for the company, and, in pursuance of those instructions, he did so, that is, bought it for the company and not for himself, then he is not liable for the price for which it was knocked down, and the verdict should, under such circumstances, be in favor of the defendant. The evidence in the case is contradictory. I do not see how you can reconcile it. You will do so, if you can; and, if you cannot reconcile it, you must determine what witnesses you will believe. You have seen the parties and the witnesses and have noted their manner of testifying, and, from all the testimony, which you will carefully consider, whether I have particularly referred to it or not, you will decide who is entitled to a verdict at your hands." Under these instructions, the jury found in favor of the defendant.

The second reason presented complains that the court erred in excluding the testimony of the witnesses of-

fered in rebuttal. It is a little difficult to review the correctness of rulings under such a general reason. If it refers to the testimony of Kersey Rineer, it will be seen that he stated he was a member of the company, but was not present at the meeting of the 13th of April, when the horse was ordered to be sold. The offer was made to ask this witness whether the horse was ordered to be sold, and whether it was agreed by the company that it should be sold at a sham sale. As this was rebuttal, and the witness said that he was not present at the meeting, the court disallowed the offer. He could not in rebuttal have testified as to what happened outside of the meeting, unless reference had been made to some time and place in the defendant's testimony which it was desired to contradict. It seems to be very plain that it would have been improper for the court to have allowed the witness to answer a question which apparently was not rebuttal at all. If the reason refers to the testimony of Ira Stewart (page 44), it must be to the disallowance of the question why he proposed that the note should be paid at the Farmers Bank. His undisclosed reason could certainly have little force. He had already been permitted to testify what he did, and that, it seems to me, was as far as he could go.

The third and fourth reasons complain that the court did not give adequate instructions to the jury. It will be recollected that the whole case was submitted to them, and no special instructions, so far as the record shows, were requested. As a matter of fact, points were submitted, which were withdrawn by counsel for the defendant immediately after the conclusion of the charge. This would seem to indicate that it was perfectly satisfactory at that time.

The fifth reason involved binding instructions, and how under the facts which were elucidated such instructions could have been given I am now at a loss to see. The whole question was one of fact, and it was submitted to the jury, where it properly belonged.

Rule discharged.

*Errors assigned* were various rulings and instructions

*John A. Coyle,* with him *John M. Groff* and *William H. Keller,* for appellants.

*John E. Malone,* with him *John B. Graybill,* for appellee.

OPINION BY ORLADY, P. J., March 1, 1916:

This action of assumpsit was to recover the value of a horse, alleged to be the property of the plaintiffs, and on the trial a verdict was returned in favor of the defendant.

The whole question was one of fact. The evidence in the case was contradictory, and the jury was instructed to reconcile it if possible, and if they could not do so, then to determine which of the witnesses they would believe.

The opinion filed by Judge LANDIS in refusing a new trial, fully answers the argument of the appellant in relation to the assignments of error.

The judgment is affirmed.